IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30627
_____


AVOYELLES PUBLISHING CO; RANDY DECUIR

                              Plaintiffs - Appellants

     v.

RICHARD IEYOUB; MICHAEL J JOHNSON; MCKINLEY KELLER

                              Defendants - Appellees

_____

Appeal from the United States District Court
for the Western District of Louisiana
U.S.D.C. No.00-CV-486
_____
February 12, 2001

Before KING, Chief Judge, PARKER, Circuit Judge, and KAZEN,[*]
District Judge.

KING, Chief Judge:[**]

     Plaintiffs-Appellants Avoyelles Publishing Company and Randy

Decuir appeal the district court's judgment, which held that the

---

     [*]   District Judge for the Southern District of Texas,
sitting by designation.

     [**]   Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

district court lacked federal subject-matter jurisdiction based on the <u>Rooker</u>-<u>Feldman</u> doctrine.[1]

Because there has been no final judgment entered in state court, we REVERSE the district court's judgment based on the <u>Rooker</u>-<u>Feldman</u> doctrine denying Plaintiffs-Appellants' motion for an injunction and consolidated trial on the merits. For the same reason, we REVERSE the <u>sua</u> <u>sponte</u> dismissal of Plaintiffs-Appellants' declaratory judgment action targeting the civil damages provision of Louisiana's Electronic Surveillance Act, LA. REV. STAT. ANN. § 15:1301-1316 (West 1993). Finally, because there has been no final judgment, nor an identity of parties or cause of action, we VACATE the district court's judgment, granting a motion to dismiss the declaratory judgment action targeting the criminal provisions of the Act on <u>Rooker</u>-<u>Feldman</u>

---

[1] Because of this jurisdictional holding, the district court denied Plaintiffs-Appellants' motion for a preliminary injunction and consolidated trial on the merits. The Plaintiffs-Appellants had sought to enjoin Defendants-Appellees Michael Johnson and McKinley Keller from proceeding in state court with a civil damages action under Louisiana's Electronic Surveillance Act. <u>See</u> LA. REV. STAT. ANN. § 15:1301-1316. Also, because of this jurisdictional finding, the district court, <u>sua</u> <u>sponte</u>, dismissed Plaintiffs-Appellants' declaratory judgment action, which requested the court to find the civil damages provisions of the Act unconstitutional as applied to Plaintiffs-Appellants, under the First and Fourteenth Amendments of the United States Constitution. Finally, the district court granted Defendant-Appellee Attorney General Richard Ieyoub's motion to dismiss Plaintiffs-Appellants' declaratory judgment action, which requested the court to find the criminal penalty provisions of the Act unconstitutional as applied to Plaintiffs-Appellants, under the First and Fourteenth Amendments of the United States Constitution.

doctrine grounds.  However, because we find that Plaintiffs-Appellants named the wrong defendant, Attorney General Ieyoub, in their declaratory judgment action targeting the criminal provisions of the Act, we AFFIRM the grant of the motion to dismiss that action on the basis that there is no Article III standing for their claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs-Appellants Avoyelles Publishing Company, owner of the Avoyelles Journal, together with Randy Decuir, editor of the Avoyelles Journal (Avoyelles Publishing Company and Randy Decuir being herein collectively called "Avoyelles-Decuir"), oversee a weekly newspaper printed and circulated in Avoyelles Parish, Louisiana.  Defendant-Appellee Michael Johnson is a former District Judge for Avoyelles Parish.  Defendant-Appellee McKinley Keller is an Avoyelles Parish Police Juror.  Defendant-Appellee Richard Ieyoub is the Attorney General of Louisiana.[2]

On November 6, 1996, Carol Aymond, Jr., a lawyer and former candidate for judge in Avoyelles Parish, called a public press conference at which a reporter from the Avoyelles Journal was in attendance.  At that press conference, Aymond played a recording of alleged conversations between Johnson and Keller and provided

---

[2]    The facts, herein, were stipulated to and included in the district court's opinion.

3

a typed transcript of the taped conversations.[3]  Aymond

represented to those in attendance that the tape had been made

legally.  On November 7 and 8, 1996, the <u>Alexandria</u> <u>Daily</u> <u>Town</u>

<u>Talk</u>, owned by Central Newspapers, Inc. ("CNI"), printed articles

on the press conference in which portions of the taped

conversations were quoted.  On November 10, 1996, the <u>Avoyelles</u>

<u>Journal</u> reported on the press conference and quoted similar

portions of the tape printed by the <u>Alexandria</u> <u>Daily</u> <u>Town</u> <u>Talk</u>.

The <u>Avoyelles</u> <u>Journal</u> also printed a column entitled "Alphonse

Sez" wherein the author commented on the contents of the taped

conversations.

Because of the publication of the conversations, Johnson and

Keller brought felony criminal complaints against Aymond, and on

November 25, 1996, Aymond was arrested for allegedly violating

§ 15:1303 of the Electronic Surveillance Act (the "Act").[4]  The

---

[3]  The conversations involved alleged vote buying in
Avoyelles Parish.

[4]  Section 15:1303 provides in relevant part:

A. Except as otherwise specifically provided in this
Chapter, it shall be unlawful for any person to:
(1) Willfully intercept, endeavor to intercept, or
procure any other person to intercept or endeavor to
intercept, any wire or oral communication;
(2) Willfully use, endeavor to use, or procure any other
person to use or endeavor to use, any electronic,
mechanical, or other device to intercept any oral
communication when:
(a) Such device is affixed to, or otherwise transmits a
signal through, a wire, cable, or other like connection
used in wire communication;  or
(b) Such device transmits communications by radio or

Avoyelles Parish District Attorney recused himself from handling the criminal prosecution of Aymond and transferred the charges to Attorney General Ieyoub.[5]

On December 2, 1996, Johnson and Keller brought a civil suit against Aymond, Avoyelles Publishing, Decuir, John Doe (the author of the "Alphonse Sez" column), and CNI in state district court for violating § 15:1303 of the Act. Avoyelles-Decuir claimed in answer to the state court civil suit that the Act

interferes with the transmission of such communication;
(3) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this Subsection; or
(4) Willfully use, or endeavor to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this Subsection.
B. Any person who violates the provisions of this Section shall be fined not more than ten thousand dollars and imprisoned for not less than two years nor more than ten years at hard labor, without benefit of probation, parole, or suspension of sentence.

LA. REV. STAT. ANN. § 15:1303 (West 1993).

[5] Pursuant to Article IV, § 8 of the Louisiana Constitution, the Attorney General is granted the authority to intervene in a civil action or proceeding and, upon written request of a district attorney, to advise and assist in a criminal case. LA. CONST. art. IV, § 8. In a motion for recusal signed by Eddie Knoll, District Attorney for Avoyelles Parish, Knoll requested "that because of the possibility of a conflict of interest and in order to avoid even the slightest appearance of impropriety, his office be recused from investigation and/or prosecution of the above captioned case." The motion was granted on May 7, 1997.

would be unconstitutional under the First Amendment if statutorily construed to apply to the publication of the newspaper articles. Ieyoub was notified, as required by state law, of the possible constitutional challenge to the Act and initially chose not to participate.

In a state court proceeding, the district court addressed the Act when ruling on Exceptions filed by Aymond and CNI. The state district court denied Aymond's Exception of No Cause of Action, but granted CNI's Exception of No Cause of Action. Johnson and Keller appealed the state district court's grant of CNI's Exception to the Louisiana Third Circuit Court of Appeal ("Third Circuit"), which reversed the trial court on April 1, 1998. The Third Circuit held that the constitutionality of the Act was not properly before the state district court, and thus, it was error to decide upon it. See Johnson v. Aymond, 97-1466 (La. App. 3 Cir. 4/1/98), 709 So. 2d 1072, 1075, writ denied, 98-1181 (La. 6/19/98), 720 So. 2d 1214. CNI applied for writ to the Louisiana Supreme Court, which denied the applications on June 19, 1998. See Johnson v. Aymond, 720 So. 2d 1214 (La. 1998). Avoyelles-Decuir were not parties to the Exceptions, the appeal, or the applications for writ.

In state district court, Avoyelles-Decuir filed motions for summary judgment, which were granted without written reasons, but which referred to the written reasons issued on CNI's Exception. Johnson and Keller appealed the grant of summary

6

judgment directly to the Louisiana Supreme Court.  The Louisiana Supreme Court subsequently transferred the matter again to the Third Circuit, finding an "independent review of the record reveals that the trial court's judgment never rendered the Act unconstitutional."  After this transfer, the Third Circuit then reversed the grant of summary judgment in favor of Avoyelles-Decuir and, in an opinion of December 23, 1998, reasoned that the Act did not violate the First Amendment.  The Third Circuit concluded that a literal reading of the Act did not exempt media entities from the prohibition on electronic surveillance and dissemination and did not violate "the federal []or state constitutional guarantee of freedom of the press."

Avoyelles-Decuir filed an application for writ to the Louisiana Supreme Court seeking review of the Third Circuit's opinion.  CNI also filed an application for writ, although it was not a party to the appeal.  The Louisiana Supreme Court denied both applications for writ.  CNI then filed for writ to the United States Supreme Court seeking review of the Third Circuit's opinion.  The writ to the United States Supreme Court was denied.

On March 10, 2000, Avoyelles-Decuir filed suit in federal court seeking preliminary and permanent injunctions[6] and a

---

[6]  The parties have stipulated that both Johnson and Keller are public figures in Avoyelles Parish.  Further, the parties have stipulated that Johnson and Keller will file criminal charges against Avoyelles-Decuir in state court and sue

7

consolidated trial on the merits, a declaratory judgment, damages, and attorneys' fees against Johnson and Keller, and seeking declaratory relief and attorneys' fees against Ieyoub as Attorney General.[7]  Specifically, Avoyelles-Decuir sought injunctive and declaratory relief against Johnson and Keller, enjoining them from proceeding with their state civil damages suit and also attempting to prevent future civil damages actions under the Act should Avoyelles-Decuir decide to republish the information.  As to Ieyoub, Avoyelles-Decuir sought a declaration that the criminal penalties under the Act could not be applied constitutionally to members of the press who reported on information that may have been obtained in violation of the Act.  After a hearing on the abstention and jurisdictional issues, the district court held that the court lacked jurisdiction to review the case under the Rooker-Feldman doctrine.[8]

Avoyelles-Decuir timely appeal.

## II. STANDARD OF REVIEW

Avoyelles-Decuir for damages again in state court if Avoyelles-Decuir republish the information or attempt to introduce the recordings and/or transcripts in state court proceedings.

[7]  In federal district court, CNI successfully moved to intervene as a plaintiff, but did not appeal to this court.

[8]  The precise holdings of the district court are described in note 1 supra.

8

We review questions of federal subject-matter jurisdiction de novo.  See Delgado v. Shell Oil Co., 231 F.3d 165, 175 (5th Cir. 2000).  Similarly, we review a district court's grant of a motion to dismiss for lack of subject-matter jurisdiction de novo.  See Cardoso v. Reno, 216 F.3d 512, 514 (5th Cir. 2000); Rodriguez v. Tex. Comm'n on the Arts, 199 F.3d 279, 280 (5th Cir. 2000).

## III. JURISDICTION

At the outset, we emphasize the important role abstention plays in our federal system.  "[W]e have recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief."  Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 718 (1996).  Numerous abstention doctrines have been developed to effectuate a proper federal-state balance in resolving litigation in both federal and state courts.  See, e.g., Younger v. Harris, 401 U.S. 37, 43 (1971); Samuels v. Mackell, 401 U.S. 66, 72 (1971); see also Steffel v. Thompson, 415 U.S. 452, 462 (1974); Huffman v. Pursue, Ltd., 420 U.S. 592, 604 (1975); Hicks v. Miranda, 422 U.S. 332, 349 (1975); Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1975); Juidice v. Vail, 430 U.S. 327, 336-37 (1977); Wooley v. Maynard, 430 U.S. 705, 711-12 (1977); Moore v. Sims, 442 U.S. 415, 423

9

(1979); <u>Pennzoil Co. v. Texaco</u>, 481 U.S. 1, 10 (1987); <u>New Orleans Pub. Serv., Inc. v. Council of City of New Orleans</u>, 491 U.S. 350, 367-68 (1989).

Of course, despite the availability of abstention, federal courts have a concomitant responsibility to exercise the jurisdiction granted to them by Congress. See <u>Quackenbush</u>, 517 U.S. at 716 ("[F]ederal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress."); <u>see also</u> <u>Colo. River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976) (recognizing "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"). Because the district court's holding was based on the <u>Rooker-Feldman</u> doctrine, this case presents a question of jurisdiction, not abstention.[9] Our holding, therefore, necessarily does not address the propriety of other possible abstention doctrines available to the district court.

---

[9] The Supreme Court recently referred to the <u>Rooker-Feldman</u> doctrine as the "Court's <u>Rooker</u>/<u>Feldman</u> abstention doctrine," thus perhaps blurring the distinction between jurisdictional doctrines and abstention doctrines. See <u>Johnson v. De Grandy</u>, 512 U.S. 997, 1005 (1994). Analytically, however, it is generally understood that the <u>Rooker-Feldman</u> doctrine bars a federal district court's jurisdiction to review a case, precluding even a consideration of available abstention doctrines. See <u>Pennzoil v. Texaco</u>, 481 U.S. 1, 10 (1987) (finding that lower court should have abstained from deciding the issue before the court; however, in recognizing the propriety of federal abstention, the Court also implicitly recognized that the <u>Rooker-Feldman</u> doctrine did not bar the district court's federal jurisdiction to decide those abstention questions).

The narrow question before this court is whether the Rooker-Feldman doctrine, as applied in the Fifth Circuit, is applicable to the facts of the case. More precisely, the question is whether the district court had subject-matter jurisdiction to deny Avoyelles-Decuir's motion for an injunction and to grant Ieyoub's motion to dismiss the declaratory judgment action. Because our answer turns on the particular development of the Rooker-Feldman doctrine in this circuit, and the finality of the state court decision in this case, we address each point in turn.

## A. The Rooker-Feldman Doctrine

The Rooker-Feldman doctrine takes its name from two Supreme Court cases, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). The doctrine provides that "federal district courts lack jurisdiction to entertain collateral attacks on state judgments." United States v. Shepherd, 23 F.3d 923, 924 (5th Cir. 1994). The justification for this jurisdictional bar is found by negative implication in 28 U.S.C. § 1257, which provides that "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari[.]" 28 U.S.C. § 1257 (1993). Because no parallel provision exists similarly granting appellate jurisdiction over state court

11

decisions by federal district courts, courts have reasoned "that 'federal district courts, as courts of original jurisdiction, lack appellate jurisdiction to review, modify, or nullify final orders of state courts.'" Weekly v. Morrow, 204 F.3d 613, 615 (5th Cir. 2000) (quoting Liedtke v. State Bar of Tex., 18 F.3d 315, 317 (5th Cir. 1994)).[10]

Application of this doctrine is clarified by examining the Feldman case. In Feldman, a District of Columbia bar applicant was denied bar admission because he had not graduated from an accredited law school. See Feldman, 460 U.S. at 465. Feldman appealed to the D.C. Court of Appeals for a waiver of the accreditation requirement and was denied. Feldman then sought relief in federal court, challenging the adverse decision of his application and bringing general constitutional challenges to the bar rules. See id. at 468. In determining jurisdiction, the Supreme Court distinguished between "Feldman's broad-based challenges to the constitutionality of the bar's rules and his challenges to the constitutionality of his individual disciplinary proceedings." Musslewhite v. State Bar of Tex., 32 F.3d 942, 945 (5th Cir. 1994) (interpreting Feldman in the context of Fifth Circuit Rooker-Feldman jurisprudence).

---

[10]  This doctrine also arises from the negative inference in 28 U.S.C. § 1331, which establishes that a district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1993).

The Supreme Court found that federal courts do have subject-matter jurisdiction to review "general constitutional attacks," see id. at 946,[11] but do not have subject-matter jurisdiction over "challenges to state-court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional." Feldman, 460 U.S. at 496.

Courts have expanded this jurisdictional limitation to include general constitutional challenges that are "inextricably intertwined" with the state court judgment. See Musslewhite, 32 F.3d at 946 ("[T]he Feldman distinction meant that a general constitutional attack that is nonetheless 'inextricably intertwined' with a state court judgment [] cannot be properly heard in federal court."); see also Shepherd, 23 F.3d at 924 ("If the district court is confronted with issues that are 'inextricably intertwined' with a state judgment, the court is 'in essence being called upon to review the state-court decision,' and the originality of the district court's jurisdiction precludes such a review." (citations omitted)).

Despite general agreement about the basic rule of Rooker-Feldman, the doctrine has developed differently among the

_____

[11]    The Supreme Court's precise language in the context of state bar rules was: "United States district courts, therefore, have subject-matter jurisdiction over general challenges to state bar rules, promulgated by state courts in non-judicial proceedings, which do not require review of a final state-court judgment in a particular case." Feldman, 460 U.S. at 486.

13

circuits.[12]  Recent scholarly commentary has examined these differences and the interplay between the Rooker-Feldman doctrine and other traditional forms of preclusion.[13]

    We are bound, however, by the existing Fifth Circuit precedent that has interpreted Rooker-Feldman in a manner consistent with the requirements of the full faith and credit requirement.  See Davis v. Bayless, 70 F.3d 367, 376 (5th Cir. 1995) ("[O]ur Circuit has not allowed the Rooker-Feldman doctrine to bar an action in federal court when that same action would be allowed in the state court of the rendering state."); see also Am. Airlines, Inc. v. Dep't of Transp., 202 F.3d 788, 801 n.9 (5th Cir. 2000) ("[W]e have not applied the Rooker-Feldman jurisdictional bar in cases where we have found it inappropriate to require a federal court to give full faith and

_____

    [12]  See, e.g., H.C. v. Koppel, 203 F.3d 610, 612 (9th Cir. 2000); Kiowa Indian Tribe v. Hoover, 150 F.3d 1163, 1169-71 (10th Cir. 1998); Richardson v. D.C. Court of Appeals, 83 F.3d 1513, 1515 (D.C. Cir. 1996); Charchenko v. City of Stillwater, 47 F.3d 981, 983 (8th Cir. 1995); GASH Assocs. v. Village of Rosemont, 995 F.2d 726, 728 (7th Cir. 1993).

    [13]  See, e.g., Thomas D. Rowe, Jr., Rooker-Feldman: Worth Only the Power to Blow It Up?, 74 NOTRE DAME L. REV. 1081 (1999); Suzanna Sherry, Judicial Federalism in the Trenches: The Rooker-Feldman Doctrine in Action, 74 NOTRE DAME L. REV. 1085 (1999); Barry Friedman & James Gaylord, Rooker-Feldman, From the Ground Up, 74 NOTRE DAME L. REV. 1129 (1999); Susan Bandes, The Rooker-Feldman Doctrine: Evaluating Its Jurisdictional Status, 74 NOTRE DAME L. REV. 1175 (1999); Jack M. Beermann, Comments on Rooker-Feldman or Let State Law Be Our Guide, 74 NOTRE DAME L. REV. 1209 (1999); Howard M. Erichson, Interjurisdictional Preclusion, 96 MICH. L. REV. 945 (1998); Gary Thompson, The Rooker-Feldman Doctrine and the Subject Matter Jurisdiction of Federal District Courts, 42 RUTGERS L. REV. 859 (1990).

credit to a state court judgment."). For example, in <u>Gauthier v. Continental Diving Services. Inc.</u>, this court "decline[d] to apply <u>Rooker</u>-<u>Feldman</u> in a way that would require a federal court to give greater deference to a state court judgment than a court of the state in which the judgment was rendered would give it." 831 F.2d 559, 561 (5th Cir. 1987). This court found:

> <u>Rooker</u>-<u>Feldman</u> casts in jurisdictional terms a rule that is very close if not identical to the more familiar principle that a federal court must give full faith and credit to a state court judgment. To satisfy the full faith and credit requirement, a federal court must give the same deference to a state court judgment that a court of the rendering state would give it.

<u>Id.</u> (citations omitted); <u>see also</u> <u>Davis</u>, 70 F.3d at 376. Our determination of the <u>Rooker</u>-<u>Feldman</u> issue, thus, turns on the preclusive effect Louisiana courts would give to the Third Circuit's reversal of summary judgment in favor of Johnson and Keller, a decision that also decided the constitutionality of the Act. As will be demonstrated, Louisiana's res judicata law comports with this circuit's existing jurisprudence, requiring a final state court judgment before the <u>Rooker</u>-<u>Feldman</u> doctrine bars federal jurisdiction.

### B. Final Judgments Under Louisiana's Res Judicata Law

The question whether Avoyelles-Decuir would be barred from litigating their claims in Louisiana state court is determined by analyzing Louisiana's res judicata law. Louisiana's res judicata statute, LA. REV. STAT. ANN. § 13:4231, provides:

15

Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:

(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.

(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.

(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.

LA. REV. STAT. ANN. § 13:4231 (West 1993). As a Louisiana court recently explained, res judicata is broadly construed:

La. R.S. 13:4231 embraces the broad usage of the phrase "res judicata" to include both claim preclusion (res judicata) and issue preclusion (collateral estoppel). Under claim preclusion, a final judgment on the merits precludes the parties from relitigating matters that were or could have been raised in that action. Under issue preclusion or collateral estoppel, however, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue in a different cause of action between the same parties.

Hudson v. City of Bossier, 33,620 (La. App. 2 Cir. 8/25/00), 766 So. 2d 738, 743, writ denied, (La. 11/27/00). Therefore, "[a]fter a final judgment, res judicata bars relitigation of any subject matter arising from the same transaction or occurrence of a previous suit. . . . A judgment determining the merits of a case is a final judgment." Tate v. Prewitt, 33,895 (La. App. 2 Cir. 9/27/00), 769 So. 2d 800, 803, reh'g denied, (10/26/00).

16

"Once a final judgment acquires the authority of the thing adjudged, no court has jurisdiction to change the judgment." Id. at 804.[14]

Further, the res judicata doctrine requires "the existence of three 'identities' between the previous and subsequent suits: (1) the thing demanded must be the same; (2) the cause of action must be the same; and (3) the same parties must be appearing in the same capacity." Gilbreath v. Gilbreath, 32,292 (La. App. 2 Cir. 9/22/99), 743 So. 2d 300, 303; see also Thurston v. Thurston, 31895 (La. App. 2 Cir. 8/20/99), 740 So. 2d 268, 269-70 (recognizing the three identities and finding that "[t]he doctrine of res judicata is strictly construed. Any doubt regarding compliance with its requirements is to be resolved in favor of maintaining the plaintiff's action.").

---

[14] The 1990 comments to Louisiana's res judicata statute, LA. REV. STAT. ANN. § 13:4231, provide guidance about the definition of a valid final judgment. Under the heading "Valid and Final," the Comment explains:

> To have any preclusive effect a judgment must be valid, that is, it must have been rendered by a court with jurisdiction over subject matter and over parties, and proper notice must have been given. The judgment must also be a final judgment, that is, a judgment that disposes of the merits in whole or in part. The use of the phrase "final judgment" also means that the preclusive effect of a judgment attaches once a final judgment has been signed by the trial court and would bar any action filed thereafter unless the judgment is reversed on appeal.

LA. REV. STAT. ANN. § 13:4231 cmt. D.

17

Two important principles are distilled from the above review of Louisiana law.  First, in order for the doctrine of res judicata to apply, there must be a final judgment.  See State v. Shaddinger, 97-439 (La. App. 5 Cir. 10/28/97), 702 So. 2d 965, 970 ("The principle of res judicata is applicable only where a final judgment has been rendered."), writ denied, 97-2989 (La. 2/6/98), 709 So. 2d 743; G.B.F. v. Keys, 29,006 (La. App. 2 Cir. 1/22/97), 687 So. 2d 632, 634 ("In order to plead res judicata, it is necessary that there be a final judgment."), writ denied, 97-0385 (La. 3/21/97), 691 So. 2d 94.  Second, there must be an identity of parties and cause of action between the suits.

## 1. The District Court's Denial of Avoyelles-Decuir's Motion for an Injunction and Consolidated Trial on the Merits on Rooker-Feldman Grounds

In the instant case, the district court determined that the Third Circuit's reversal of the grant of summary judgment to Avoyelles-Decuir was a judgment that barred federal district court review of Avoyelles-Decuir's motion for an injunction and consolidated trial on the merits.  While we agree with the principle that such federal intervention in ongoing state proceedings implicates serious concerns of federalism, we disagree with the district court's application of the Rooker-Feldman doctrine.  See H.C. v. Koppel, 203 F.3d 610, 612 (9th

18

Cir. 2000) ("Because we are not asked to review the merits of a final state judgment, but rather to enjoin ongoing state proceedings, we conclude that principles of abstention rather than Rooker-Feldman govern this case.").

From our review of Louisiana law, this reversal of a grant of summary judgment is not a final judgment implicating res judicata and, thus, under the law of this circuit, not a final judgment implicating the Rooker-Feldman doctrine.  See Lee v. Allied Chem. Co., 337 So. 2d 525, 525 (La. 1976) (stating in a denial of a writ of certiorari, "Since the court of appeal reversed a summary judgment and remanded[,] the judgment is not final and will not be reviewed at this time"); Lorio v. Safeco Ins. Co., 318 So. 2d 54, 54 (La. 1975) (similarly denying writ and stating, "Since the matter was remanded for trial upon reversal of summary judgment, . . . the judgment is not final"). The parties in oral argument before the district court also appear to have conceded that the Third Circuit's decision was not a final judgment,[15] and the district court found "[i]t is

_____

[15]  At the April 20, 2000 federal district court proceeding, the district court asked Special Assistant Attorney General Michael Skinner: "And you would agree that we don't have a situation where the state has rendered a final judgment?"  To which Skinner responded: "I believe that's correct, your honor." In similar fashion, John Baker, attorney for Avoyelles-Decuir, argued to the court: "[Y]our honor has already indicated, and Mr. Skinner agreed with you, that there was no final judgment for purposes of state court at this point, and that knocks out Rooker-Feldman."
Further, if the Third Circuit's opinion was a final judgment with res judicata effect, CNI would have been barred from raising

19

true, as the plaintiffs argue, that no final judgment has been reached in the state court matter."

While our holding on the Rooker-Feldman doctrine turns on the above analysis of Louisiana law, we note that this requirement of a final state judgment has been a consistent requirement in this circuit's federal Rooker-Feldman jurisprudence. As is evidenced by the purpose and language of Feldman and subsequent cases, the Rooker-Feldman doctrine in this circuit has always been triggered by some state court final judgment. Feldman, itself, involved a final judicial decision of the highest court of a jurisdiction, see 460 U.S. at 486, thus tracking § 1257's requirement of "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had." 28 U.S.C. § 1257. This circuit has also followed the rule that there must be some final judgment of some state court before the Rooker-Feldman doctrine bars federal jurisdiction. See Weekly v. Morrow, 204 F.3d 613, 615 (5th Cir. 2000) (finding Rooker-Feldman to bar federal district court review after appellant appealed state judgment at each level of Louisiana state court system and then to the United States Supreme Court); Reitnauer v. Tex. Exotic Feline Found. Inc., 152 F.3d 341, 344 (5th Cir. 1998) (finding district court violated

the issues again in state court. At the time of briefing for this appeal, there was a scheduled state court hearing planned for May 5, 2000 on the constitutional issues, which apparently were not barred by Louisiana res judicata law.

20

the Rooker-Feldman doctrine by sitting in appellate review of the state court judgment); Davis v. Bayless, 70 F.3d 367, 376 (5th Cir. 1995) (finding judicial order authorizing receivers to take possession of receivership property not to be a final judgment under Texas law and thus to preclude application of the Rooker-Feldman doctrine); Liedtke v. State Bar of Tex., 18 F.3d 315, 317 (5th Cir. 1994) (finding state court default judgment disbarring lawyer, which was not timely and properly appealed in state court, barred federal review under the Rooker-Feldman doctrine); Phinizy v. Alabama, 847 F.2d 282, 283 (5th Cir. 1988) (disallowing under the Rooker-Feldman doctrine a federal challenge to an Alabama probate court's judgment that had been appealed several times through state and federal courts).[16]  We

---

[16]  Despite the pattern of requiring a final judgment in this circuit, the level of the required state court judgment has not been conclusively established.  For example, on one occasion, this court has interpreted the Rooker-Feldman doctrine to apply only to final state court judgments as rendered by the highest court of a state in which a decision could be had.  See In re Meyerland, 960 F.2d 512, 516 (5th Cir. 1992) ("Under the Rooker-Feldman line of cases, federal statute defines 'final state court judgments' as those 'rendered by the highest court of a state in which a decision could be had.'" (quoting 28 U.S.C. § 1257(a)).  In contrast, in a pre-Meyerland case, this court held that the Rooker-Feldman doctrine barred federal review of a state court divorce decree that had been entered and was being appealed.  See Hale v. Harney, 786 F.2d 688, 691 (5th Cir. 1986) ("We hold no warrant to review even final judgments of state courts, let alone those which may never take final effect because they remain subject to revision in the state appellate system.").  Hale did not involve a decision of the state's highest court, as it invoked Rooker-Feldman on the basis of a state trial court divorce decree that was final (subject to appeal).  Hale has been cited for the holding that the Fifth Circuit does not require a final judgment for purposes of Rooker-Feldman.  While Hale stands

21

note that other circuits have differed on what stage of state judgment precludes federal jurisdiction in <u>Rooker</u>-<u>Feldman</u> cases.[17]

Therefore, under this analysis, at a minimum there must be some state court final judgment before the <u>Rooker</u>-<u>Feldman</u> doctrine properly precludes federal jurisdiction. Because the

for the proposition that the <u>Rooker</u>-<u>Feldman</u> doctrine can be invoked before a final judgment <u>of the highest state court</u>, it does not resolve the question whether the <u>Rooker</u>-<u>Feldman</u> doctrine applies even before a final judgment <u>of a state court</u>.

We need not definitively resolve this conflict today, because following both <u>Meyerland</u> and <u>Hale</u>, this circuit has always required that there be at least some final state court judgment from some state court, a requirement that is lacking in the instant case.

[17] For example, some circuits have invoked <u>Rooker</u>-<u>Feldman</u> without a final judgment on the merits. <u>See</u> <u>Richardson v. D.C. Court of Appeals</u>, 83 F.3d 1513, 1515 (D.C. Cir. 1996) (finding that <u>Rooker</u>-<u>Feldman</u> applies to state court's interlocutory judgments); <u>Charchenko v. City of Stillwater</u>, 47 F.3d 981, 983 n.1 (8th Cir. 1995) (holding that the <u>Rooker</u>-<u>Feldman</u> doctrine is broader than claim and issue preclusion because it does not rely on final judgments). Other circuits have required that a final judgment issue before <u>Rooker</u>-<u>Feldman</u> can be applied. <u>See</u> <u>United States v. Owen</u>, 54 F.3d 271, 274 (6th Cir. 1995). In a recent First Circuit case, the court keyed its <u>Rooker</u>-<u>Feldman</u> final judgment analysis to whether, under § 1257, the Supreme Court could grant certiorari. <u>See</u> <u>Hill v. Town of Conway</u>, 193 F.3d 33, 40 (1999). The court focused on the language in § 1257 granting Supreme Court review of "final judgments or decrees rendered by the highest court of a State <u>in which a decision could be had</u>." <u>Id.</u> (quoting 28 U.S.C. § 1257). The court then found that when a state supreme court (the highest court) exercises its discretion to decline to review a judgment of a lower state court, then since the judgment of that lower state court is reviewable by the United States Supreme Court on certiorari, the <u>Rooker</u>-<u>Feldman</u> doctrine bars collateral review in federal district court. <u>See</u> <u>id.</u> The <u>Hill</u> case gives credence to the <u>Meyerland</u> interpretation of <u>Rooker</u>-<u>Feldman</u>. <u>See</u> <u>In re Meyerland</u>, 960 F.2d at 516 (focusing on the "highest court of a state" language in § 1257); <u>see also</u> <u>supra</u> note 16.

22

reversal of summary judgment is not such a final judgment under Louisiana law, the Rooker-Feldman doctrine is not applicable. After a reversal of summary judgment, the state trial court is now charged with determining the merits of the cause of action. While we recognize that the trial court may well come to the same conclusion as the Third Circuit in regard to its constitutionality, it is not compelled to do so.[18]  In any event,

_____

[18]  While the Third Circuit's reversal of summary judgment and determination of the constitutional issues may provide "the law of the case," the law of the case does not have res judicata effect.  See Keller v. Thompson, 134 So. 2d 395, 398 (La. Ct. App. 1962) (recognizing the general rule that the law of the case should control subsequent decisions, but also that the law of the case is not a final judgment and therefore not res judicata and thus not conclusively binding).  Under the law of the case doctrine in Louisiana, courts will generally defer to legal determinations such as the one made by the Third Circuit.  Avenue Plaza, L.L.C. v. Falgoust, 96-0173 (La. 7/2/96), 676 So. 2d 1077, 1080.  However, the decision to defer to these legal determinations is not equivalent to res judicata.  See Keller, 134 So. 2d at 398; see also Marsh Eng'g v. Parker, 96-1434 (La. 9/27/96), 680 So. 2d 637, 637 n.3 (Lemmon, J., concurring) ("The 'law of the case' doctrine may apply as to [the litigated] issue in the intermediate court on an appeal after the district court on remand renders a judgment deciding the entirety of the merits. However, while an appellate court has the power to revisit an issue when the 'law of the case' doctrine applies, no court has the power to change a judgment that has become res judicata.").  As this court recognized in Loumar, Inc. v. Smith, while the two concepts are similar, the law of the case doctrine is a pragmatic and not a mandatory consideration:

> The law of the case doctrine is closely related to the principle of res judicata.  The latter prevents collateral attack on the result of a completed lawsuit between the same parties; the former prevents collateral attacks against the court's rulings during the pendency of a lawsuit. . . . Res judicata, however, is categoric and requires that respect be accorded the prior judgment, while the law of the case doctrine is merely a "rule of practice, based upon sound policy that when an issue is once litigated and decided,

23

there will be no final judgment with res judicata effect until the trial court determines the issue.[19]  This judgment, of course, will be reviewed through the proper state appellate process, and the Third Circuit is within its discretion to reverse itself on the constitutional issues.  Accordingly, the

---

that should be the end of the matter."

698 F.2d 759, 762 (5th Cir. 1983) (citing United States v. U.S. Smelting Ref. & Mining Co., 339 U.S. 186, 198 (1950)); see also Peques v. Morehouse Parish Sch. Bd., 706 F.2d 735, 738 (5th Cir. 1983).  In the instant case, not only has the state district court not ruled on the constitutionality of the statute, but the constitutional issues were never briefed or argued by Avoyelles-Decuir in any of the state court litigation.  Thus, the Third Circuit could well hear the argument and reverse itself on appeal.  We decline to extend the Rooker-Feldman doctrine to bar federal jurisdiction when law of the case doctrine applies, as it has the potential to create conflict with the law in this circuit and has not been briefed by the parties.  Abstention doctrines serve well enough to resolve the issues without modifying our Rooker-Feldman jurisprudence.

[19]  Supporting the ongoing nature of the proceedings, the Third Circuit recently denied an application for a writ by Aymond (not a party in the federal case) recognizing:

[T]he ruling of the trial court as to the constitutionality of the Louisiana Electronic Surveillance Act, La. R. S. 15:1301 et seq., as applied to the facts of this case can be reviewed following the trial on the merits.  Therefore, at this point in the litigation, we decline to exercise this court's supervisory jurisdiction to review the trial court's ruling.
With respect to the trial court's declaring the foregoing statutory scheme unconstitutional insofar as criminal proceedings are concerned, we find that the trial court was without authority to decide this issue as the only matter before the trial court at this time is the civil proceeding; consequently, this portion of the trial court's ruling is obiter dictum.

Johnson v. Aymond, No. CW-00-00786 (La. App. 3 Cir. 7/7/00) (unpublished denial of writ).

24

lack of a final judgment precludes application of the Rooker-Feldman doctrine, and the district court erred in applying it.

## 2. The District Court's Grant of Defendants-Appellees' Motion to Dismiss the Declaratory Judgment Actions

Because the district court granted Ieyoub's motion to dismiss on Rooker-Feldman grounds, we address that jurisdictional bar first. The Rooker-Feldman doctrine, however, does not end our analysis as to the district court's subject-matter jurisdiction. On appeal, Ieyoub also raises an Eleventh Amendment argument, stating that because the Attorney General has no direct authority to bring criminal charges against Avoyelles-Decuir, the declaratory judgment action is barred as a suit against the state. However, because we find that this lack of authority negates Avoyelles-Decuir's Article III standing to bring the declaratory judgment action, we do not reach the Eleventh Amendment issue.

## a. Rooker-Feldman and the Declaratory Judgment Action Targeting the Criminal Provisions of the Act

Under Louisiana's res judicata law, Avoyelles-Decuir's general declaratory challenge to the criminal penalties provision of the Act does not constitute a relitigation of the Third Circuit's reversal of summary judgment in the civil suit. In addition to the lack of a final judgment, which under the law of this circuit, precludes application of the Rooker-Feldman

25

doctrine, under Louisiana law, the requirements of "identity of the parties" and "identity of the cause of action" are not met.

As to identity of the parties, the Third Circuit's reversal of summary judgment involved only the civil suit brought by Johnson and Keller. No criminal charges have been brought against Avoyelles-Decuir, and at no point was Ieyoub a party to the state litigation. Therefore, neither Ieyoub nor any other state official charged with enforcing the Act can rely on the res judicata effect of the state court's reversal of summary judgment on a civil damages action. See Burkhalter v. Palmer, 2000-0491 (La. App. 4 Cir. 4/26/00), 764 So. 2d 85, 87, reh'g denied, (7/17/00) (finding that res judicata did not apply without identity of parties); see also FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 841 (3d Cir. 1996) (finding that third parties not involved in state action are not barred by Rooker-Feldman); United States v. Owens, 54 F.3d 271, 274 (6th Cir. 1995) (finding that Rooker-Feldman applies only to parties who participated in the state litigation).

In addition, a declaratory judgment action challenging threatened criminal penalties may provide a different "cause of action" than what was decided by the Third Circuit. The litigation would be based on a new complaint and based on a challenge to the criminal portions of the Act not at issue in Johnson and Keller's lawsuit. Accordingly, res judicata, and thus under the jurisprudence of this circuit, Rooker-Feldman,

26

would not apply to prevent state or federal courts from hearing Avoyelles-Decuir's declaratory judgment action against the criminal application of the Act.[20]

b. The Eleventh Amendment and the Declaratory Judgment Action Targeting the Criminal Provisions of the Act

As stated, Ieyoub first raised the Eleventh Amendment issue on appeal.[21]  Ieyoub argues that the Eleventh Amendment, as interpreted by the Supreme Court, bars suits against the state. See U.S. CONST. amend. XI; Edelman v. Jordan, 415 U.S. 651, 663 (1974); Ex Parte Young, 209 U.S. 123, 153 (1908); Hans v. Louisiana, 134 U.S. 1, 13-15 (1890).  In this case, because Ieyoub, as Attorney General, does not have specific enforcement power in criminal matters, and thus does not have enforcement

---

[20]  We recognize that the district court's sua sponte dismissal of the declaratory judgment targeting the civil penalties provision of the Act presents a difficult question whether this declaratory challenge is a relitigation of the civil damages action brought by Johnson and Keller.  It has been stipulated in the record that Avoyelles-Decuir will be sued again by Johnson and Keller if the recorded information is republished, and thus there exists threatened action of new civil litigation potentially not resolved by the Third Circuit's decision. However, a federal court's declaration that the civil provisions of the Act are unconstitutional would implicate the constitutional judgment of the Third Circuit and would raise legitimate questions of federal review of state court opinions. At this point in the litigation, without a final judgment entered in state court, we need not parse the "inextricably intertwined" nature of these claims.

[21]  This court may reach the Eleventh Amendment question in this posture.  See Calderon v. Ashmus, 523 U.S. 740, 745 n.2 (1998) (recognizing that the Eleventh Amendment issue can be raised at any stage of the proceedings).

27

power to prosecute Avoyelles-Decuir, Ieyoub argues that the declaratory judgment action is, in essence, a suit against the state. See Young, 209 U.S. at 153 ("[I]t is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.").

Ieyoub's argument is based on the delegation of statutory powers in Louisiana. Under Article IV, § 8 of the Louisiana Constitution, the Attorney General is granted authority to prosecute only "upon the written request of a district attorney, to advise and assist in the prosecution of a criminal case . . . [or] for cause, when authorized by the court which would have original jurisdiction and subject to judicial review." LA. CONST. art. IV, § 8. The true authority and responsibility to prosecute criminal matters in Louisiana lies with the local district attorney, pursuant to Article V, § 26(B) of the Louisiana Constitution, which states: "Except as otherwise provided by this constitution, a district attorney, or his designated assistant, shall have charge of every criminal prosecution by the state in his district." LA. CONST. art. V, § 26(B), see also Guidry v. Roberts, 331 So. 2d 44, 52-53 (La. App. 1 Cir. 1976), aff'd in part & rev'd in part on other grounds, 335 So. 2d 438 (La. 1976) ("It is clear that a district attorney has the sole authority to determine when and against

28

whom a criminal charge shall be instituted subject only to the power vested in the attorney general to supercede that authority upon a showing of cause."). As Ieyoub correctly argues, in order for his prosecutorial power to be invoked, the district attorney must first recuse himself and request the Attorney General's assistance. See Fox v. Reed, CIV.A.No. 99-3094, 2000 WL 288379, at *5 (E.D. La. Mar. 16, 2000) ("Under Louisiana law, the Attorney General may not bring a criminal prosecution solely on his authority. The Louisiana Constitution vests that authority in the first instance in local district attorneys.").

In the instant case, Ieyoub is the named defendant, presumably because the district attorney recused himself from the criminal prosecution of Aymond. Avoyelles-Decuir are correct that Ieyoub has specific authority to prosecute Aymond and has more than a "general enforcement power" and, thus, more than "some connection" in the prosecution of Aymond.[22] The difficulty, as is apparent, is that there is simply no guarantee that the district attorney in any future prosecution would recuse himself from the matter.[23]

---

[22] We acknowledge Avoyelles-Decuir's concern that Ieyoub's office has conducted a grand jury investigation into the matter, an investigation that has resulted in subpoenas issued to reporters who work for Avoyelles Publishing. This investigation, however, was targeted toward Aymond.

[23] We also acknowledge Avoyelles-Decuir's argument that any subsequent prosecution will be based on the original recording and would thus implicate the same issues for the district attorney in regard to his recusal. However likely this

29

Thus, in arguing that the Attorney General lacks the criminal authority to prosecute Avoyelles-Decuir, Ieyoub highlights a more fundamental jurisdictional problem in this case: namely that Avoyelles-Decuir, in framing their declaratory action against Ieyoub, have failed to establish that they have Article III standing for this claim. See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 555 n.22 (5th Cir. 1996) ("Standing is a jurisdictional requirement, and may always be addressed for the first time on appeal."). Constitutional standing, as a requirement of Article III justiciability, is a threshold inquiry. See Calderon v. Ashmus, 523 U.S. 740, 745 (1998) (declining to decide the Eleventh Amendment issue on which the Court granted certiorari because, "in keeping with our precedents, [we] have decided that we must first address whether this action for a declaratory judgment is the sort of 'Article III' 'case or controversy' to which federal courts are limited"); United States v. Hays, 515 U.S. 737, 742 (1995) ("[W]e are required to address the issue [of standing] even if the courts below have not passed on it, and even if the parties fail to raise the issue before us. The federal courts are under an independent obligation to examine their own jurisdiction, and

_____

eventuality may be, it may also be the case that a subsequent district attorney could be in office who would not have the same conflict of interest as Eddie Knoll and, thus, would not recuse himself. We refuse to base our decision on factual scenarios that may not occur.

standing 'is perhaps the most important of [the jurisdictional] doctrines'" (quoting FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990))).  Following Calderon, we first address the standing issue.  See 523 U.S. at 745.

### c. Article III Standing and the Declaratory Judgment Action

### Targeting the Criminal Provisions of the Act

A brief review of our standing jurisprudence demonstrates Avoyelles-Decuir's error in naming Ieyoub as the defendant in their declaratory judgment action.  The Supreme Court has recognized three requirements of Article III standing:

> It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'-- an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

Hays, 515 U.S. at 742-43 (footnote, citations, and internal quotation omitted) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

The difficulty in Avoyelles-Decuir's standing lies in the second element of the standing analysis, that there is no causal connection between the "injury" and the "conduct complained of." Because Avoyelles-Decuir chose to name Ieyoub and not the district attorney charged with enforcing criminal penalties under the Act, the declaratory judgment action fails to link

31

Ieyoub to the injury.  In order to establish a "causal connection," there must be causation between the challenged conduct of the defendant and the claimed injury.  See Lujan, 504 U.S. at 560; see also Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976).

In the instant action, defendant Ieyoub is statutorily prevented from enforcing the Act that would cause the injury. Thus, in this particular factual situation, the lack of connection undermines Article III standing.  See S. Pac. Transp. v. Brown, 651 F.2d 613, 615 (9th Cir. 1980) (holding that plaintiffs lacked standing for suit against Attorney General when the district attorneys, and not the Attorney General, were statutorily charged with enforcing the laws); Shell Oil Co. v. Noel, 608 F.2d 208, 212-13 (1st Cir. 1979) (finding no Article III case or controversy in declaratory judgment action against Attorney General and Governor where there was no showing that defendants had the authority to enforce the act in question and there was no threat to enforce act); see also 1st Westco Corp. v. Preate, 6 F.3d 108, 114-15 (3d Cir. 1993).

Because Avoyelles-Decuir fail to demonstrate the causal connection prong of our standing requirement, we do not address the redressability element of the proposed declaratory judgment action.  Further, because our standing analysis makes unnecessary a further discussion of the Eleventh Amendment, we

32

do not address the issue.

**IV. CONCLUSION**

For the foregoing reasons, we REVERSE the district court's judgment except insofar as it dismissed the declaratory judgment action targeting the criminal provisions of the Act, such dismissal being AFFIRMED.  We do not foreclose the use of any other appropriate abstention doctrine.  We REMAND for further proceedings consistent with this opinion.  Each party shall bear its own costs.